Rufus R. PRICE, Appellant,

v.

UNITED STATES, Appellee.

No. 01–CF–934.

District of Columbia Court of Appeals.

Argued Nov. 7, 2002.
Decided Dec. 26, 2002.

Sydney J. Hoffman for appellant.

Mary G. Leary, Assistant United States Attorney, with whom Roscoe C. Howard, Jr., United States Attorney, and John R. Fisher, Thomas J. Tourish, Jr., and John J. Soroka, Assistant United States Attorneys, were on the brief, for appellee.

Before WAGNER, Chief Judge, and TERRY and GLICKMAN, Associate Judges.

WAGNER, Chief Judge.

Appellant, Rufus R. Price, was indicted along with two co-defendants, Alphonso King and Anthony Thompson, on charges of first-degree murder while armed (premeditated) (M I w/a) (D.C.Code §§ 22–2401,[1] –3202[2] (1996)); possession of a firearm during a crime of violence (PFCV) (*i.e.*, M I w/a premeditated) (D.C.Code § 22–3204(b)[3] (1996)); first-degree murder while armed-felony murder (purposely) (D.C.Code §§ 22–2401, –3202); possession of a firearm during a crime of violence (*i.e.*, M I w/a-felony murder) (D.C.Code § 22–3204(b) (1996)); assault with intent to kill while armed (AWIK w/a) (D.C.Code §§ 22–501,[4] –3202 (1996)); possession of a firearm during a crime of violence (*i.e.*, AWIK w/a) (D.C.Code § 22–3204(b)); and carrying a pistol without a license (CPWL) (D.C.Code § 22–3204(a) (1996))—one count as to each co-defendant. In a joint trial, the trial court (Judge Rufus King) granted Price's motion for judgment of acquittal on the felony murder and PFCV counts. The jury returned a verdict of not guilty on the first-degree murder while armed count. A mistrial was granted on the remaining charges for which the jury could not reach unanimous verdicts. Subsequently, Price's co-defendants entered guilty pleas, and Price had a second trial on the following offenses: second-degree murder while armed (M II w/a); PFCV (related to M II w/a); assault with intent to kill while armed (AWIK w/a); PFCV (related to AWIK w/a); and CPWL. The jury returned guilty verdicts against Price on the following charges: assault with a dangerous weapon (ADW), as a lesser-included offense of AWIK w/a; PFCV (related to

1. Section 22–2401 has been recodified as D.C.Code § 22–2101 (2001).

2. Section 22–3202 has been recodified as D.C.Code § 22–4502 (2001).

3. Section 22–3204 has been recodified as D.C.Code § 22–4504 (2001).

4. Section 22–501 has been recodified as D.C.Code § 22–401 (2001).

the ADW, the lesser-included offense of AWIK w/a) and CPWL. They acquitted Price of second-degree murder while armed and AWIK w/a.[5] Price argues that the evidence was insufficient to support his convictions of carrying a pistol without a license and assault with a dangerous weapon. We conclude that the evidence was insufficient to prove beyond a reasonable doubt that the pistol Price carried was operable, and therefore, reverse his conviction of carrying a pistol without a license. Otherwise, we affirm the judgment of the trial court.

## I.

The charges arose out of the murder of Levar Cunningham, which occurred on November 25, 1998 at about 11:00 p.m. in the area of Eastern Avenue and Sheriff Road, N.E. in the District of Columbia. According to the testimony of Tanina Ashmon, while in the area that night, she saw Price and his former co-defendants, Alphonso Jenkins and Anthony Thompson, each carrying handguns, walking around the neighborhood. She described the weapons as "regular nine's" or ".38," about eight to ten inches long. She heard Alphonso King "ranting and raving about killing everybody on the block." Ashmon, who admitted that she had been out there selling marijuana, followed the men. She saw another man, Michael Moore, whom she knew only as M & M, walking down the street. Then she saw M & M standing between Price, King and Thompson, and she heard Price ask M & M who shot at his car, while King continued a tirade about "niggers in the hood." Ashmon testified that as she continued walking, the "ranting and raving" continued, and then multiple shots rang out. She then ran.

Michael Smith, who lived in an apartment building in the 1900 block of 52nd Street, N.E. at the time, testified that he heard several shots at about 11:15 p.m. that night, and from his window he saw three men running away from Sheriff Road after the shooting stopped. According to Smith, within minutes, more shots rang out, and he noticed a few people hiding behind a car. When the shooting stopped the last time, Smith saw Michael Moore emerge from behind a car and go towards a body.

Michael Moore testified that he lived in the area and was a close friend of Levar Cunningham, the decedent. He testified that they had a cookout that evening which Cunningham attended. Moore testified that sometime after the event ended, some men came into the area, and Cunningham told him to run, and both of them ran to the top of 52nd Street. Moore recounted that while on 52nd Street and Sheriff Road, he saw Price, King and Thompson, whom he knew from the neighborhood, walking towards him. He heard Price "discussing something that went on some days before." Moore testified that King and Thompson appeared to be upset about something, while Price was cordial and appeared to be "just laid back with it." According to Moore, after the discussion ended, King, who had a black semi-automatic Baretta, shot Cunningham. He testified that Thompson also had a semi-automatic weapon, and Price had a revolver. Moore testified that both Thompson and King were pointing their weapons, while Price had his weapon at his side. He further testified that when the shot was fired at Cunningham, Price appeared to be surprised. After Cunningham was shot, he and Price ran in different directions.

---

5.  The jury had been instructed not to consider the PFCV predicated on the M II w/a, if it acquitted him of that charge.

Moore testified that he heard additional shots, but he could not tell who was firing them because he ran down the street and hid behind a car on Sheriff Road. After the shooting, Moore went back to the area where he saw Cunningham, who was on the ground with a fatal gunshot wound to the head. The police arrived within minutes; however, Moore did not tell the police that he had witnessed the shootings until two or three years later.

There was evidence that eleven shell casings were recovered from the area where the three armed men were located at the time of the shootings. Six of the cartridge casings were determined to be .38 Winchester casings, which were fired from the same semi-automatic handgun; the five others were fired from the same .45 caliber semi-automatic handgun. The police also recovered a copper bullet jacket with some markings, but the government's expert witness, Torin Suber, testified that he could not determine exactly what type of weapon it came from, although he thought it was a .45 based on its weight. The expert testified that he could not determine what type of weapons were used to fire additional bullet fragments and a mutilated copper bullet jacket. There was testimony that shell casings are emitted from semi-automatic weapons upon firing, but not from revolvers. According to Moore's testimony, King and Thompson were carrying semi-automatic weapons, while Price had a revolver. The police searched for other ballistic evidence in the area of Sheriff Road and 52nd Street, but none was found.

## II.

■ Price argues that the evidence was insufficient to support his conviction for carrying a pistol without a license because there was neither direct nor circumstantial evidence to prove that the weapon he allegedly carried was operable.[6] The government responds that sufficient evidence, direct and circumstantial, was presented to establish that the pistol that Price carried was operable, although the weapon was not shown to have been fired at the time of the commission of the offenses or recovered and test fired thereafter.

■ The essential elements of the offense of carrying a pistol without a license are: "(1) carrying an operable pistol; (2) without a license; and (3) with the intent to do those two acts." *Curington v. United States,* 621 A.2d 819, 823 (D.C.1993) (citing *Tucker v. United States,* 421 A.2d 32 (D.C.1980)). Price does not contest the proof of possession and that he had no license to carry a pistol. He argues only the lack of proof that the weapon was operable. We have held that when the accused is charged with carrying a pistol without a license under D.C.Code § 22–3204(a), the government must prove that the weapon was operable. *Anderson v. United States,* 326 A.2d 807, 811 (D.C. 1974), *cert. denied,* 420 U.S. 978, 95 S.Ct. 1405, 43 L.Ed.2d 659 (1975); *see Curtice v. United States,* 488 A.2d 917, 918 (D.C. 1985). While the statute itself does not specify that operability is an element of the offense, we have so interpreted it, consistent with the purpose of this provision and the overall statutory scheme. *See Strong v. United States,* 581 A.2d 383, 387– 88 (D.C.1990); *see also Morrison v. United States,* 417 A.2d 409, 412 (D.C.1980) (citations omitted).

6. Price also argues that the government failed to establish his guilt of this offense based on an aiding and abetting theory related to the weapons used by his co-defendants. However, the government concedes in its brief that it did not proceed on that theory in the trial court and that it does not argue this theory on appeal.

The government argues that the pistol's operability can be inferred from circumstantial evidence. It contends that evidence that a defendant displayed a weapon in a manner intended to back up his demands and have the victim believe the weapon was capable of discharge is sufficient to permit the jury to infer that the weapon is capable of discharging a bullet. Indeed, we have held that operability may be proved by direct or circumstantial evidence. *Key v. United States*, 587 A.2d 1072, 1074 (D.C.1991). Price challenges the sufficiency of the facts and circumstances to prove operability in this case. He argues that in addition to the absence of any evidence that he actually fired the pistol, there was evidence that he did not point or fire the weapon.

In support of its position, the government relies upon this court's decisions in *Morrison, supra* and *Bartley v. United States*, 530 A.2d 692 (D.C.1987). In *Morrison*, we affirmed a conviction for carrying a pistol without a license where the defendant's weapon was not recovered and was not fired during the commission of the armed burglary and armed robbery for which he was also convicted. 417 A.2d at 412–13. There, we held that the circumstances of the offenses were such as to permit a jury to infer that the pistol Morrison carried was operable nevertheless. *Id.* at 413. That evidence showed that Morrison kept the male victim at bay by pointing the gun at him as he lay prone on the floor of one room, while his two armed cohorts searched for valuables in a bedroom occupied by two female victims. *Id.* One of Morrison's companions actually discharged his weapon during the robbery. *Id.* We held that it was reasonable for a jury to infer from these facts that the gun used by Morrison to control the male victim was operable. *Id.*

The significant difference between the facts in *Morrison* and the present case are that: (1) the witnesses testified that Price never pointed his weapon at anyone; and (2) he was never left on his own to control the victim without the assistance of his cohorts, who clearly had operable weapons. It cannot be assumed or inferred under these circumstances that just because Price's companions had operable semi-automatic weapons, Price's handgun, which he never pointed or fired, according to the evidence, also must have been operable. The government simply failed to present evidence establishing either that Price fired his weapon, pointed it, or otherwise affirmatively displayed a belief that his weapon was operable. In fact, the evidence here tends to dispel the notion that Price's weapon could fire. For, in spite of all the bullets fired that evening, the eleven cartridge casings examined were shown to be the type which could be fired from the weapons Price's co-defendants possessed, but could not be fired by the type of weapon that Price allegedly carried. Although a search was made for other ballistic evidence, none was found which could be connected with a revolver.

In *Bartley*, the other case relied upon by the government, the two defendants were charged with armed robbery and two counts each of assault with intent to rob while armed. 530 A.2d at 693. The "while armed" elements were charged pursuant to D.C.Code § 22–3202(a) alternatively, as with a pistol or imitation thereof.[7] *Id.* The defendants, who were found guilty of two counts of assault with a dangerous weapon

---

7. D.C.Code § 22–3202(a) provides enhanced penalties for

 Any person who commits a crime of violence, or a dangerous crime in the District of Columbia when armed with or having readily available any pistol or other firearm (or imitation thereof) or other dangerous or deadly weapon . . . .

and robbery while armed with an operable pistol, argued on appeal that the evidence was insufficient to permit the jury to conclude that the weapons used were operable.[8] *Id.* at 697. Citing *Morrison, supra,* 417 A.2d at 413, we affirmed the convictions, noting that "[j]ust as it would have been reasonable for [the robbery victims' to believe that the defendants' weapons were operable], so too it would be reasonable for the jury [to conclude likewise]." The facts in *Bartley* are distinguishable from those in this case. There, the two defendants brandished their weapons at the victims to enforce their robbery demands. Thus, they clearly and unambiguously displayed, during the commission of the crime, conduct tending to show that their weapons were operable. Here, the government did not present any evidence that Price displayed such knowledge or belief.

■ There is another critical distinction which makes *Bartley* unpersuasive in deciding this case. A different statute was at issue in *Bartley.* The issue in *Bartley* arose under D.C.Code § 22–3202(a). Operability is not a key element of this provision of the Code. Section 22–3202(a) adds penalties when offenders commit crimes of violence while armed with a pistol, real or imitation, and any one of a number of specified dangerous or deadly weapons. In contrast, the provision at issue in this case, D.C.Code § 22–3204(a), unlike other D.C. weapons statutes, does not include imitation firearms or firearms which are incapable of expelling a projectile. *See Strong, supra,* 581 A.2d at 387. Section 3204(a) prohibits mere possession of a pistol no matter its use because the weapon itself, when operable, is dangerous. The requirement of operability under this section is supported by the statute's purpose, *i.e.,* "to protect citizens from actual injury which may be caused by the use of a dangerous weapon." *Strong,* 581 A.2d at 387 (citations omitted). We have recognized that it is operability that makes a pistol dangerous, and prohibition of the unlicensed possession of a pistol furthers the statutory purpose of protecting public safety.[9] *Id.* While the weapons covered under § 22–3202(a) are prohibited from possession when used in connection with the commission of a crime of violence or dangerous crime, mere possession is prohibited under § 22–3204(a) only for operable weapons.

That the legislature intended to include within the ambit of § 22–3204(a) only operable weapons is supported by the later enacted provision § 22–3204(b), which allows prosecution for possession of a pistol or any other firearm or imitation firearm while committing a crime of violence. Significantly, when the legislature added this new section, it did not modify the requirement for real pistols for the possessory offense of carrying a pistol without a license in subsection (a). With respect to the distinction between the amendment and the possessory offense section, we observed in *Strong,* that

> [t]he amendment illustrates a legislative intent to vary the definition of "dangerous weapon" according to the circumstances of its use. When an object is used to coerce others into submitting to illegal requests, what is significant is whether the victims believe the item is a weapon. When, however, the item is

---

8. The convictions of assault with a dangerous weapon were as lesser-included offenses of assault with intent to rob while armed, for which the court granted defense motions to dismiss. *Bartley,* 530 A.2d at 693, n. 1.

9. The government does not argue here that it is not required to prove operability.

merely being carried, the question is whether it may actually be used to harm someone.

*Strong, supra,* 581 A.2d at 388.[10]  That same observation is applicable in this case. The offense charged here is the possessory offense under § 22–3204(a), and the question is whether it is actually operable so that it may be used to harm someone. Therefore, we do not consider *Bartley,* which was concerned with § 22–3202(a) rather than § 22–3204(a), to be controlling here.

Similarly, this court's recent opinion in *Arrington v. United States,* 804 A.2d 1068 (D.C.2002), involved the sufficiency of the armed element under D.C.Code § 22–3202(a)(1), rather than the possessory offense covered by D.C.Code § 22–3204(a). Thus, we do not find it persuasive support for the government's argument that operability was sufficiently established by evidence that Price simply had a pistol in his possession while his companions committed the shootings.

Even though we have held that operability of a weapon may be proved by circumstantial evidence, we conclude that the circumstances presented here are insufficient to prove the charge beyond a reasonable doubt. *See Key, supra,* 587 A.2d at 1074; *see also Curtice, supra,* 488 A.2d at 917–18. Even viewed most favorably to the government, the evidence showed only that Price had what appeared to be a revolver which he never pointed while with two men who had operable semi-automatic weapons. It is too speculative to infer from these facts that Price's weapon, which the other evidence tends to show was not used, must also have been operable. Indeed, the opposite inference is just as likely, since all of the ballistic evidence is consistent with the bullets being fired only from the weapons of Price's former co-defendants. Therefore, his conviction of carrying a pistol without a license must be reversed.

### III.

■ Price argues that the evidence was insufficient to support his conviction of assault with a dangerous weapon on Michael Moore either as a principal or aider and abettor. He contends that the uncontroverted evidence was that the assault on Moore occurred after the shooting, and the evidence showed that Price ran away at that time. Thus, he contends that the ADW conviction and the associated PFCV conviction must be reversed. The government responds that the evidence shows that Price's actions aided and abetted that of his two associates and that a reasonable juror could infer reasonably that he participated in the shooting.

■ To prove the charge of assault with a dangerous weapon, the government must prove beyond a reasonable doubt that the accused: (1) attempted with force and violence to injure another; (2) at the time had "the apparent present ability to injury the victim"; (3) intended to perform the acts constituting the assault; and (4) committed the assault with a dangerous weapon. *Williamson v. United States,* 445

---

**10.** In *Strong,* the appellant was acquitted of assault, but convicted of carrying a dangerous weapon under D.C.Code § 22–3204 based upon his possession of an inoperable air pistol which resembled a .357 magnum handgun. 581 A.2d at 384. He argued that there was insufficient proof that the weapon was dangerous for purposes of § 22–3204. At the time of the commission of the offense, D.C.Code § 22–3204(b) had not been enacted. However, we found the subsequent amendment instructive in rejecting the government's efforts to expand § 22–3204 (which was similar to § 22–3204(a)(1) in prohibiting possession of a pistol or a deadly or dangerous weapon) to include imitation firearms. *Id.* at 388–89.

A.2d 975, 978–79 (D.C.1982) (citations omitted); *see also* Criminal Jury Instructions for the District of Columbia, No. 4.07 (4th ed.1993). D.C.Code § 22–105 (1996) [11] sets forth the elements required to convict one of aiding and abetting the commission of an offense.[12] To establish that the accused aided and abetted the commission of crimes alleged, the government must prove that: (1) the offense was committed by someone; (2) the accused participated in the commission of the offense; and (3) he or she did so with guilty knowledge. *Murchison v. United States*, 486 A.2d 77, 81 (D.C.1984) (citing *Byrd v. United States*, 364 A.2d 1215, 1219 (D.C.1976) and *Blango v. United States*, 335 A.2d 230, 235 (D.C.1975)). In other words, to be convicted of the offense on an aiding and abetting theory, the government must prove that the defendant associated himself with the criminal activity, participated in it as something he wanted to bring about, and took some action to make it succeed. *Wesley v. United States*, 547 A.2d 1022, 1026 (D.C.1988) (citing *Settles v. United States*, 522 A.2d 348, 357 (D.C.1987) (other citation omitted)). "The indictment need not include a charge of aiding and abetting [in order for the theory to be presented to the jury]." *Head v. United States*, 451 A.2d 615, 626 (1982), *cert. denied*, 513 U.S. 854, 115 S.Ct. 156, 130 L.Ed.2d 95 (1994) (citing *Mason v. United States*, 256 A.2d 565, 567 (D.C.1969) and *United States v. Boone*, 177 U.S.App. D.C. 265, 266, 543 F.2d 412, 413 (1976)). While there must be evidence that someone other than defendant was the principal whom he or she aided and abetted, it is not necessary for conviction that the principal's identity be established. *See Brooks v. United States*, 599 A.2d 1094, 1099 (D.C.1991) (citation omitted).

Price relies upon *Jones v. United States*, 625 A.2d 281 (D.C.1993), to support his argument. In *Jones*, a jury convicted Jones of assault with a dangerous weapon as a lesser included offense of assault with intent to kill while armed on an aiding and abetting theory, while it convicted his co-defendant of only the greater offense. *Id.* at 282. There was evidence that the co-defendant stabbed the victim. *Id.* at 283. Before the stabbing, Jones had been seen talking to his co-defendant, and both looked in the direction of the victim. *Id.* Jones walked past the victim, however, and continued up the street. *Id.* By the time the stabbing was over, Jones had turned around, and he was observed rejoining the co-defendant and walking away together. *Id.* We held the evidence against Jones insufficient for conviction because it did not show that Jones had done anything to encourage or facilitate the stabbing. *Id.* at 289. Jones is distinguishable from the present case. In *Jones*, while the defendant had been with the assailant before and after the assault, there was no evidence that he did anything to facilitate the crime or that he even knew that criminal activity was intended. In the present case, Price's companions expressed their intent to shoot everyone on the block and he remained with them, while armed, during the commission of the offenses.

The government argues that the evidence was sufficient to establish that

11. Section 22–105 has been recodified as D.C.Code § 22–1805 (2001).

12. Section 22–105 states:
In prosecutions for any criminal offense all persons advising, inciting, or conniving at the offense, or aiding and abetting the principal offender, shall be charged as principals and not as accessories, the intent of this section being that as to all accessories before the fact the law heretofore applicable in cases of misdemeanor only shall apply to all crimes, whatever the punishment may be.

Price's actions encouraged and facilitated his associates' assault of Moore. It contends that Price's behavior showed that he was not merely present, but acted in an enterprise with the other two men. Evidence that Price was with the principal shooters before the crime, during the crime, and flight with them after the crime, was sufficient, the government argues, to prove that he aided and abetted the commission of the assault with a deadly weapon upon Moore.

As to the first element of aiding and abetting the commission of the assault with a dangerous weapon, there is no dispute that King and Thompson shot at Moore, who ran behind a parked car, and that a bullet fragment was found inside one of the parked automobiles in that area. Thus, there was proof that an assault was committed on Moore with a dangerous weapon.

The second element requires proof that the aider and abettor was not only present at the crime scene, but also that his conduct encouraged or facilitated the commission of the offense. *Jones, supra,* 625 A.2d at 288 (citing *Griggs v. United States,* 611 A.2d 526, 528 (D.C.1992)). The evidence established Price's presence before and during the murder and assault on Moore. He arrived in the area with his two companions, and like them, had a weapon in view. As the three walked together, one of the men threatened to kill everyone on the block. Price remained with the other two men as they surrounded Moore, and it was Price who demanded to know from Moore who shot at his car. Price remained present as King continued to threaten everyone on the block and shot and killed Cunningham. While the three men were together, two of them shot at

Moore, whom they knew witnessed Cunningham's murder. Price fled from the crime scene at about the same time as his two companions. We have held such evidence to be sufficient to support a conviction of aiding and abetting the commission of the principal offense. *See Settles, supra,* 522 A.2d at 358; *In re A.B.H.,* 343 A.2d 573, 575 (D.C.1975).

In *Settles,* the defendants were convicted of multiple offenses, including kidnaping and rape. 522 A.2d at 349 n. 2. One of the defendants, Whitley, argued on appeal that the evidence was insufficient to convict him as an aider and abettor of these offenses. There was evidence that Whitley was with Settles, the principal perpetrator, before and during the commission of the crimes, and fled with him afterwards. *Id.* at 358. He stood within three to four feet of the partially open basement door where Settles had taken the victim, to rape her, which was a strong deterrent to any attempt of the victim to escape. *Id.* Whitley did nothing to stop the attack, although the victim acknowledged knowing Whitley when she first saw him, and her young son screamed and cried as Settles raped his mother. On these facts, we held that " '[t]he inference that [Whitley's] presence by the [basement door] 'designedly encouraged' or 'facilitated' the [assault] is clearly warranted.' " *Id.* (citing *Creek v. United States,* 324 A.2d 688, 689 (D.C.1974)). We said that "the jury could find that by not availing himself of opportunities to withdraw from the scene, [Whitley] gave his tacit approval and encouragement to what Settles was doing." *Id.* (citations omitted).[13]

In *A.B.H.,* the appellant, a juvenile was found guilty of robbery (purse snatching).

---

**13.** The case was reversed for a new trial on other grounds. *Settles, supra,* 522 A.2d at 356.

The victim could not identify the robber, whom she described as being between the ages of twelve and fourteen years old. 343 A.2d at 574. Just minutes after the robbery, alerted by yelling and screaming, the police saw appellant and his co-respondent running next to each other with another person chasing them. *Id.* The co-respondent threw the victim's coin purse and several other items to the ground when the police identified themselves. *Id.* We held that "evidence of appellant's close association with the co-respondent prior to and after ·the purse snatching, his presence very near the scene of the crime and his flight from the scene with the co-respondent was sufficient to support the conviction." *Id.* at 575.

Viewing the evidence in the light most favorable to the government, as we must, and considering the precedents in *A.B.H.* and *Settles,* the evidence was sufficient to support Price's conviction on an aiding and abetting theory.[14] Here, as in *A.B H.,* Price was at the scene of the crime with the two men and made his escape at the same time. Like the appellant in *Settles,* he never distanced himself from the crimes. Indeed, he demanded to know who had shot at his car as one of his companions threatened to kill everyone on the block. He had a weapon in view while his two cohorts had their deadly weapons out as they made their threats. From his actions, it was reasonable to infer that he knew about the crimes, took some part in the confrontation, facilitated its commission by his demand and armed presence, and remained until making his escape after the offenses were completed. This evidence is sufficient to support the convictions. *See A.B.H., supra,* 343 A.2d at 575; *Settles, supra,* 522 A.2d at 358–59.

14. In light of our disposition of this issue, we need not consider whether the evidence was

For the foregoing reasons, the conviction for assault with a deadly weapon is affirmed, and the conviction of carrying a pistol without a license is reversed.

*So ordered.*

sufficient to prove that Price was guilty as a principal.